## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **SCOTT ROGERS**, on behalf of himself and all others similarly situated,<br><br>                          Plaintiff,<br><br>v.<br><br>**CHW GROUP, INC. d/b/a CHOICE HOME WARRANTY,**<br><br>                   Defendant. | **Case No. 21-cv-226** |

**Plaintiff's Opposition to Defendant's Motion to Dismiss Second Amended Complaint**

Table of Contents

DEFENDANT'S RULE 12(b)(1) MOTION TO DISMISS ............................................................ 2

I.  Facial Attack: Plaintiff Pleads Injury-in-Fact. ................................................................ 2

II.  Defendant's Factual Attack is Improper. .......................................................................... 4

DEFENDANT'S 12(b)(6) MOTION TO DISMISS ................................................................... 4

I.  Plaintiff Sufficiently Pleads a Violation of § 227(b)'s Prohibition on Calls Using an
Artificial or Prerecorded Voice. ............................................................................................ 4

    a.  Plaintiff Pleads That Defendant Initiated the Calls. ............................................. 5

    b.  Plaintiff Pleads That the Calls Were Telemarketing. ........................................... 5

    c.  Plaintiff Pleads That the Calls Were Made Using an Artificial or Prerecorded Voice.... 7

    d.  Plaintiff Pleads That Defendant Lacked Prior Express Written Consent. .................... 10

    e.  Count I and Count II are not Redundant. ............................................................. 15

II.  Plaintiff Pleads a Violation of § 227(c)'s Prohibition of Telephone Solicitations to
Person's Whose Telephone Numbers are on the National Do-Not-Call Registry. ................. 16

    a.  Plaintiff Pleads That the Calls Were Telephone Solicitations. ............................ 16

    b.  Plaintiff Pleads That He Received From Defendant More Than One Call in a 12-Month
Period. .......................................................................................................................... 17

    c.  Plaintiff Pleads That He Was a Residential Telephone Subscriber. .................... 17

    d.  Plaintiff Pleads That his Telephone Number was on the National Do-Not-Call Registry
at the Time of the Calls. ............................................................................................... 20

III.  Plaintiff Sufficiently Pleads a Violation of § 227(c)'s Requirement that a Company
Implement Policies, Procedures, and Training Prior to Telemarketing. ................................ 21

    a.  Plaintiff Pleads that Defendant did not Have a Written Do-Not-Call Policy Available
Upon Demand. .............................................................................................................. 23

    b.  Plaintiff Pleads that Defendant did not Have Proper Policies and Training to Honor Do-
Not-Call Requests. ....................................................................................................... 24

DEFENDANT'S RULE 12(f) MOTION TO STRIKE .............................................................. 25

I.  Class Allegations ............................................................................................................ 25

    a.  Motions to Strike Class Allegations are Disfavored. .......................................... 25

    b.  Plaintiff's Proposed Class Definitions are not Failsafe. ...................................... 26

    c.  Defendant's Predominance Argument is Meritless and Premature. ..................... 28

    d.  Plaintiff's Proposed "Registry" and "Policy" Class Definitions are not Overbroad. ...... 30

    e.  Plaintiff's Class Definitions are not "Impermissibly Vague". ............................. 31

    f.  Plaintiff's Class Definitions are not Redundant .................................................. 32

II.  "Superfluous" Allegations ............................................................................................. 33

    a.  Other Complaints ................................................................................................ 33

    b.  Websites Not Used ............................................................................................. 34

CONCLUSION ........................................................................................................................ 34

i

**Cases**

*Ahmed v. HSBC Bank United States, Nat'l Ass'n*
  2017 U.S. Dist. LEXIS 183912 (C.D. Cal. Nov. 6, 2017)......................................... 29

*Alhassid v. Bank of Am., N.A.*
  307 F.R.D. 684 (S.D. Fla. 2015)................................................................................ 26

*Allard v. SCI Direct, Inc.*
  2017 U.S. Dist. LEXIS 107106 (M.D. Ten. July 10, 2017) .................................... 22

*Allard v. SCI Direct, Inc.*
  2017 U.S. Dist. LEXIS 107106 (M.D. Tenn. July 10, 2017) .................................. 11

*Ammons v. Ally Fin., Inc.*
  305 F. Supp. 3d 818 (M.D. Tenn. 2018)................................................................... 19

*Ammons v. Ally Fin., Inc.*
  326 F. Supp. 3d 578 (M.D. Tenn. 2018)................................................................ 5, 21

*Bayou Inspection Servs. v. Orion Constr. LP*
  2013 U.S. Dist. LEXIS 34652 (E.D. La. Mar. 13, 2013)........................................... 9

*Bee, Denning, Inc. v. Capital Alliance Grp.*
  310 F.R.D. 614 (S.D. Cal. 2015) .............................................................................. 29

*Caldera v. Am. Med. Collection Agency*
  320 F.R.D. 513 (C.D. Cal. 2017).............................................................................. 29

*Charvat v. GVN Michigan, Inc.*
  561 F.3d 623 (6th Cir. 2009) .................................................................................... 22

*Chesbro v. Best Buy Stores, L.P.*
  705 F.3d 913 (9th Cir. 2012) ...................................................................................... 5

*Chinitz v. Intero Real Estate Serv.*
  2020 U.S. Dist. LEXIS 247921 (N.D. Cal. July 22, 2020)....................................... 31

*Colley v. P&G*
  2016 U.S. Dist. LEXIS 137725 (S.D. Ohio Oct. 4, 2016)........................................ 30

*Cordoba v. DIRECTV, LLC*
  320 F.R.D. 582 (N.D. Ga. 2017)............................................................................... 22

*Doe v. City of Memphis*
  928 F.3d 481 (6th Cir. 2019) .................................................................................... 25

*Dolemba v. Kelly Servs., Inc.*
2017 U.S. Dist. LEXIS 13508 (N.D. Ill. Jan. 31, 2017) ............................ 7

*Dube v. Eagle Global Logistics*
314 F.3d 193 (5th Cir. 2002) ........................................................... 9

*Evankavitch v. Green Tree Servicing, LLC*
793 F.3d 355 (3d Cir. 2015) ........................................................... 23

*Forney v. Hair Club for Men. Ltd.*
2017 U.S. Dist. LEXIS 214251 (C.D. Cal. June 26, 2017) ....................... 9

*Gentek Bldg. Prods. v. Sherwin-Williams Co.*
491 F.3d 320 (6th Cir. 2007) ......................................................... 2, 4

*George v. Shamrock Saloon II LLC*
2010 U.S. Dist. LEXIS 5646 (S.D.N.Y. Jan. 13, 2020) .......................... 7

*Glass v. Kellogg Co. Bakery*
252 F.R.D. 367 (W.D. Mich. 2008) ................................................. 9

*Glass v. Tradesmen Int'l, LLC*
505 F. Supp. 3d 747 (N.D. Ohio 2020) ............................................ 29

*Golan v. Veritas Ent., LLC*
788 F.3d 814 (8th Cir. 2015) ......................................................... 5

*Hayward v. Cleveland Clinic Found.*
759 F.3d 601 (6th Cir. 2014) ......................................................... 9

*Hill v. Homeward Residential*
799 F.3d 544 (6th Cir. 2015) ...................................................... 7, 11

*Hodgin v. Parker Waichman LLP*
2015 U.S. Dist. LEXIS 192262 (W.D. Ky. Sept. 30, 2015) ..................... 18

*In re Nationstar Mortgage, LLC*
2019 U.S. App. LEXIS 11986 (6th Cir. Apr. 23, 2019) ......................... 31

*Johansen v. Vivant, Inc.*
2012 U.S. Dist. LEXIS 178558 (N.D. Ill. Dec. 18, 2012) ....................... 9

*Kensu v. Mich. Dep't of Corr.*
2020 U.S. Dist. LEXIS 61590 (E.D. Mich. Apr. 8, 2020) ....................... 32

*Kopaleishvili v. Uzbek Logistics Inc.*
2019 U.S. Dist. LEXIS 209529 (S.D. Ohio Dec. 5, 2019) ....................... 31

iii

*Krakauer v. Dish Network, L.L.C.*
 925 F.3d 643 (4th Cir. 2019) ....................................................................... 20, 31

*Kristensen v. Credit Payment Services*
 12 F.Supp.3d 1292 (D. Nev. 2014) ................................................................... 29

*Lennartson v. Papa Murphy's Holdings, Inc.*
 2016 U.S. Dist. LEXIS 725 (W.D. Wash. Jan. 5, 2016) .................................... 12

*Lobbins v. United States*
 900 F.3d 799 (6th Cir. 2018) ............................................................................ 18

*Messner v. Northshore Univ. HealthSystem*
 669 F.3d 802 (7th Cir. 2012) ............................................................................ 31

*NUCA v. First Nat'l Bank & Trust Co.*
 522 U.S. 479, 502 (1998) ................................................................................. 18

*O'Bryan v. Holy See*
 556 F.3d 361, 375 (6th Cir. 2009) .................................................................. 2, 3

*Padilla v. Whetstone Partners, LLC*
 2014 U.S. Dist. LEXIS 95308 (S.D. Fla. July 14, 2014) ..................................... 9

*Perri v. Rescue 1 Fin., LLC*
 2015 U.S. Dist. LEXIS 95717 (C.D. Cal. July 22, 2015) ................................... 11

*Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*
 950 F.3d 959 (7th Cir. 2020) ............................................................................ 19

*Pietzak v. Microsoft Corp.*
 2015 U.S. Dist. LEXIS 165204 (C.D. Cal. Nov. 17, 2015) .................................. 7

*Pilgrim v. Universal Health Card, LLC*
 660 F.3d 943 (6th Cir. 2011) ............................................................................ 29

*Pinkard v. Wal-Mart Stores, Inc.*
 2012 U.S. Dist. LEXIS 160938, *10 (N.D. Ala. Nov. 9, 2012) .............................. 7

*Powers v. Hamilton Cty. Pub. Def. Comm'n*
 501 F.3d 592 (6th Cir. 2007) ............................................................................ 31

*Precision Specialty Metals v. United States*
 315 F.3d 1346 (Fed. Cir. 2003) .......................................................................... 9

*Progressive Health & Rehab Corp. v. Quinn Med., Inc.*
 323 F.R.D. 242 (S.D. Ohio 2017) ..................................................................... 25

iv

*Reyes v. BCA Fin. Servs., Inc.*
  2018 U.S. Dist. LEXIS 176628 (S.D. Fla. Oct. 15, 2018)........................ 28

*Rodriguez v. Premier Bankcard, LLC*
  2018 U.S. DIst. LEXIS 149225 (N.D. Ohio Aug. 31, 2018)...................... 7

*Salam v. Lifewatch, Inc.*
  2014 U.S. Dist. LEXIS 143222 (N.D. Ill. Sep. 22, 2014) ........................ 26

*Sauter v. CVS Pharm., Inc.*
  2014 U.S. Dist. LEXIS 63122 (S.D. Ohio May 7, 2014) .......................... 25

*Shelton v. Direct Energy, L.P.*
  2019 U.S. Dist. LEXIS 150559 (N.D. Ohio Aug. 27, 2019) ...................... 3

*Solo v. UPS Co.*
  819 F.3d 788 (6th Cir. 2016) ...................................................................... 15

*Soular v. Northern Tier Energy LP*
  2015 U.S. Dist. LEXIS 112294 (D. Minn. Aug. 25, 2015) ...................... 11

*Susinno v. Work Out World Inc.*
  862 F.3d 346 (3d Cir. 2017)........................................................................ 3

*Torres v. Mercer Canyons, Inc.*
  853 F.3d 1125 (9th Cir. 2016) .................................................................... 30

*United States v. Ritchie*
  15 F.3d 592 (6th Cir. 1994) ........................................................................ 2

*Wakefield v. Visalus, Inc.*
  2019 U.S. Dist. LEXIS 141974 (D. Or. Aug. 21, 2019)............................ 31

*Wick v. Twilio, Inc.*
  2016 U.S. Dist. LEXIS 151482, *4-11 (W.D. Wash. Nov. 1, 2016).......... 7

*Williams v. Pillpack, LLC*
  2021 U.S. Dist. LEXIS 27496 (W.D. Wa. Feb. 12, 2021) ........................ 31

*Wolfkiel v. Intersections Ins. Servs. Inc.*
  303 F.R.D. 287 (N.D. Ill. 2014).................................................................. 28

*Young v. Nationwide Mut. Ins. Co.*
  693 F.3d 532 (6th Cir. 2012) ...................................................................... 26

**Statutes**

47 C.F.R. § 64.1200(d)(1)............................................................................ 22

47 C.F.R. § 64.1200(d)(2) ........................................................................................ 22

47 C.F.R. § 64.1200(d)(3) ........................................................................................ 22

47 C.F.R. § 64.1200(e) ............................................................................................ 22

47 U.S.C. § 227(c)(5) .............................................................................................. 21

**Rules**

Fed. R. Civ. P. 12(b)(1) ............................................................................................ 2

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 4

Fed. R. Civ. P. 23(c)(1)(C) ...................................................................................... 31

Fed. R. Civ. P. 8(a)(3) ............................................................................................. 15

**Treatises**

Antonin Scalia & Bryan A. Garner, *Reading Law* 170 (2012) ................................ 18

Newberg on Class Actions § 7:27 (5th Ed.) ............................................................ 26

**Regulations**

18 FCC Rcd. 14014 .......................................................................................... 6, 19, 22

27 FCC Rcd 1830 ................................................................................................. 6, 11

30 FCC Rcd. 7961 ............................................................................................... passim

47 C.F.R. § 64.1200(c) ................................................................................... 16, 20, 21

47 C.F.R. § 64.1200(d) ......................................................................................... passim

47 C.F.R. § 64.1200(e) ............................................................................................. 16

47 C.F.R. § 64.1200(f)(12) ........................................................................................ 5

47 C.F.R. § 64.1200(f)(15) ....................................................................................... 16

47 C.F.R. § 64.1200(f)(3) ......................................................................................... 10

47 C.F.R. § 64.1200(f)(9) ......................................................................................... 10

47 C.F.R. § 64.1200(f)(9)(i) ...................................................................................... 10

47 C.F.R. § 64.2305(b) ............................................................................................ 18

47 C.F.R. § 64.2305(c) .......................................................................................... 19

47 C.F.R. §. 64.1200(f)(5)(i) ................................................................................. 17

7 FCC Rcd 8752 ...................................................................................................... 21

7 FCC Rcd 8752 (Oct. 16, 1992) ..................................................................... 21, 22

Defendant placed telemarketing calls to Plaintiff using a prerecorded or artificial voice without the required consent. Plaintiff's telephone number was on the National Do-Not-Call Registry at the time of these calls. Defendant did so without maintaining even the bare minimum legally required policies and procedures prior to making the calls, as evidenced by, among other things, its refusal to produce its do-not-call policy, its rude response to Plaintiff, and its intentional disregard of his do-not-call requests. This conduct constitutes three separate violations of the Telephone Consumer Protection Act ("TCPA"). Each claim and its supporting facts are pled explicitly and are more than enough to survive Defendant's Motion.

Defendant's arguments in favor of dismissal range from premature, to absurd, to borderline bad faith. As an example of the premature, Defendant moves to dismiss for lack of Article III standing based on a self-interested affidavit it submitted claiming that it does not make prerecorded calls. But this merits question is not properly resolvable on a 12(b)(1) motion.

As an example of the absurd, Defendant argues that Plaintiff's request that Defendant "stop calling him" is ambiguous. [Motion to Dismiss ("MTD"), Dkt. 19, p. 16.]

As an example of the bad faith, to support its positions, Defendant repeatedly misquotes, misrepresents, and even edits substantive language from its cited authority and Plaintiff's complaint.

Defendant's request to strike Plaintiff's class allegations rests on similarly shaky grounds. None of the classes are fail-safe or overbroad, and determining whether common issues predominate requires discovery.

Finally, Defendant's request to strike certain "superfluous" allegations from the complaint should also be rejected. The numerous public complaints about Defendant's illegal calling practices are relevant to whether Defendant's actions were willful and whether Defendant

1

maintained the required policies and procedures.

## DEFENDANT'S RULE 12(b)(1) MOTION TO DISMISS

The Sixth Circuit recognizes two types of 12(b)(1) Motions to Dismiss: facial attacks and factual attacks. *O'Bryan v. Holy See*, 556 F.3d 361, 375 (6th Cir. 2009). "A facial attack on the subject-matter jurisdiction alleged in the complaint questions merely the sufficiency of the pleading." *Id.* at 376. When reviewing a facial attack, "a district court takes the allegations in the complaint as true [and] [i]f those allegations establish federal claims, jurisdiction exists." *Id.*

A factual attack on the other hand "is not a challenge to the sufficiency of the pleading's allegations, but a challenge to the factual existence of subject matter jurisdiction." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). However, in a factual attack, a district court may engage "in a factual inquiry regarding the complaint's allegations only when the facts necessary to sustain jurisdiction do not implicate the merits of the plaintiff's claim." *Gentek Bldg. Prods. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). "If … an attack on subject-matter jurisdiction also implicates an element of the cause of action, then the district court should *find that jurisdiction exists* and deal with the objection as a direct attack on the merits of the plaintiff's claim." *Id.* (emphasis in original). "This provides a greater level of protection to the plaintiff who in truth is facing a challenge to the validity of his claim: the defendant is forced to proceed under Rule 12(b)(6) … or Rule 56 … both of which place greater restrictions on the district court's discretion…." *Id.* (citations and quotations omitted).

Defendant here makes a procedurally proper (but substantively wrong) facial attack. Its factual attack is improper.

## I.      Facial Attack: Plaintiff Pleads Injury-in-Fact.

Defendant claims that Plaintiff does not have standing because he concedes he "gave his

prior 'express consent' or 'invitation or permission' to receive the at-issue calls/texts and concedes Defendant had an internal DNC policy in place. Plaintiff's complaint does no such things. When reviewing a facial attack, "a district court takes the allegations in the complaint as true [and] [i]f those allegations establish federal claims, jurisdiction exists." *O'Bryan*, 556 F.3d at 376.

Though consent is an affirmative defense, Plaintiff specifically pleads that he did not provide prior express written consent, which is what is required for prerecorded telemarketing calls. [Second Amended Complaint, DE 14 ("SAC"), ¶¶ 94-135.] Plaintiff also pleads, however, that regardless of whether he initially gave prior express written consent, he revoked that consent on numerous occasions and continued to receive prerecorded telemarketing calls. [*Id.* at ¶¶ 45-68.] Plaintiff also pleads that his number was on the DNC Registry. [*Id.* at ¶¶ 138-140.]

Plaintiff further alleges that Defendant's refusal to honor his do-not-call requests was the result of its failure to maintain the policies, procedures, and training required by law. [*Id.* at ¶¶ 45-68 (calls continuing after Plaintiff asked Defendant to stop); ¶¶ 1-3, 50-53, 157 (Defendant's rude response to Plaintiff's written do-not-call request, and resuming the calls within minutes of that request); ¶¶ 159-163 (a sampling of the myriad complaints from other consumers about Defendant's unwanted calls and refusals to honor do-not-call requests); ¶¶ 146-165 (allegations regarding lack of policies, procedures, and training).]

Plaintiff pleads that these unwanted calls caused him to lose time; invaded his privacy; and caused a nuisance. [*Id.* at ¶ 176.] These allegations are sufficient for Article III standing. *See, e.g.*, *Shelton v. Direct Energy, L.P.*, 2019 U.S. Dist. LEXIS 150559, *7-11 (N.D. Ohio Aug. 27, 2019) (finding Article III standing on the receipt of a single unwanted phone call, and collecting cases); *Susinno v. Work Out World Inc.*, 862 F.3d 346, 351 (3d Cir. 2017) (finding concrete harm

where plaintiff alleged nuisance and invasion of privacy, "the very harm that Congress sought to prevent").

## II.     Defendant's Factual Attack is Improper.

For its factual attack, Defendant submits the self-interested declaration of its General Counsel, Brian Tretter, in which Mr. Tretter states that Defendant does not make calls using an artificial or prerecorded voice. [ECF. No. 20, ¶¶ 6-7.] If true, its theory goes, Plaintiff could not have received a prerecorded telemarketing call from Defendant.

Plaintiff's receipt of an artificial or prerecorded voice call from Defendant is an element of his § 227(b) cause of action (and has no relevance to his § 227(c) causes of action). *See* 47 U.S.C. § 227(b) ("It shall be unlawful for any person … to initiate any call … using any artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service[.]") Accordingly, because Defendant's attempted factual attack implicates the merits of Plaintiff's claim, "the district court should *find that jurisdiction* exists[.]"[1] *Gentek Bldg. Prods.*, 491 F.3d at 330.

## DEFENDANT'S 12(b)(6) MOTION TO DISMISS

## I.     Plaintiff Sufficiently Pleads a Violation of § 227(b)'s Prohibition on Calls Using an Artificial or Prerecorded Voice.

Relevantly, to state a claim for a violation of § 227(b), Plaintiff must plead that 1) Defendant initiated 2) a call or text 3) using an artificial or prerecorded voice 4) to Plaintiff's telephone number.[2] The type of consent needed, and whether that consent was obtained, is an affirmative defense upon which Defendant bears the burden. *See, e.g. Ammons v. Ally Fin., Inc.*,

---

[1] If the Court is inclined to construe Defendant's factual attack as a Rule 56 Motion, Plaintiff respectfully requests under Rule 56(d) that the Court defer consideration until after discovery.

[2] Plaintiff's § 227(b) claims are *only* for the prerecorded calls made to him. Non-prerecorded calls are actionable under Plaintiff's § 227(c) claims, which do not require the use of any specific equipment or voice.

326 F. Supp. 3d 578, 591 (M.D. Tenn. 2018); [MTD, p. 13 n 14.] In the interest of thoroughness, however, that the calls were telemarketing and thus needed prior express written consent will be discussed herein.

      a.  Plaintiff Pleads That Defendant Initiated the Calls.

Plaintiff pleads Defendant was the caller. [SAC, ¶¶ 69-86.] In support, he pleads that calling back the numbers that called him connects to persons or recordings that identify themselves as Choice Home Warranty. [*Id.* at ¶¶ 70-78.] On the inbound calls and texts to Plaintiff, the callers identified themselves as Choice Home Warranty. [*Id.* at ¶¶ 79-82.] Defendant also occasionally sent emails to Plaintiff at the exact same time it placed calls to him. [*Id.* at ¶¶ 83-85.] Finally, the calls only began after Plaintiff filled out Defendant's form on its website (even though they continued after Plaintiff asked Defendant to stop). [*Id.* at ¶ 86.] These allegations are sufficient.

      b.  Plaintiff Pleads That the Calls Were Telemarketing.

"Telemarketing" is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12). The key word in this definition is "purpose." For example, the Eighth Circuit has held in the TCPA context purpose controls, even if the call or text is devoid of telemarketing content. *Golan v. Veritas Ent., LLC*, 788 F.3d 814, 820 (8th Cir. 2015). The Ninth Circuit held similarly. *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012). Whether a call is telemarketing should be approached "with a measure of common sense." *Id*.

The FCC has also repeatedly reiterated a purpose-based approach to determining whether calls are telemarketing. In 2003, the FCC wrote that calls "*motivated in part* by the desire to

ultimately sell additional goods or services" are telemarketing. 2003 FCC TCPA Order, 18 FCC Rcd. 14014, 14098 ¶ 142 (F.C.C. 2003) (emphasis added). It further wrote that "[i]f the call is intended to offer property, goods, or services for sale either during the call, or in the future … that call is an advertisement." *Id.* The FCC held the same in 2012. 2012 FCC TCPA Order, 27 FCC Rcd 1830, 1842 ¶ 30.

Plaintiff specifically pleads that both the content and purpose of Defendant's calls were to sell Defendant's home warranty services. [SAC, ¶¶ 62, 65, 80, 87, 88.] This is sufficient at this stage.

Defendant argues that its calls were merely transactional or informational because Plaintiff inquired. [MTD, p. 13-14.]. But this does not make sense, as the TCPA requires "prior express written consent" for prerecorded or artificial telemarketing calls. If consent made the calls non-telemarketing, this requirement collapses on itself. The telemarketing determination must be made independent of and prior to an examination of the presence of consent in order to decide what type of consent is required.

Further, Defendant's position is inconsistent with the statutory scheme. While § 227(b)'s "prior express written consent" standard applies to "telemarketing" calls, the statute also contains a separately defined term—"telephone solicitations"—which is identical to "telemarketing" but excludes calls made with consent or in response to an inquiry. If a call that was made to someone who inquired about services is already not telemarketing, as would be the case under Defendant's interpretation, then why create and use elsewhere a separate term that specifically exempts such calls?

Not one of Defendant's cited authorities supports its argument. In *Hill*, the Sixth Circuit was discussing prior express consent in the context of debt collection calls (i.e. non-

telemarketing). 799 F.3d 544, 551-52 (6th Cir. 2015); *see also Rodriguez v. Premier Bankcard, LLC*, 2018 U.S. DIst. LEXIS 149225, *5-7 (N.D. Ohio Aug. 31, 2018) (same). In *Dolemba*, the court found express written consent present when plaintiff agreed in writing to receive the type of calls at issue. 2017 U.S. Dist. LEXIS 13508, *3 n.2 (N.D. Ill. Jan. 31, 2017). In *Pietzak*, the court did not even discuss the issue of "prior express written consent". 2015 U.S. Dist. LEXIS 165204 (C.D. Cal. Nov. 17, 2015).[3] In *Wick*, the court found a message sent to complete a *pending transaction* was non-telemarketing. 2016 U.S. Dist. LEXIS 151482, *4-11 (W.D. Wash. Nov. 1, 2016). *Pinkard* was decided before the prior express written consent requirement went into effect in 2013. 2012 U.S. Dist. LEXIS 160938, *10 (N.D. Ala. Nov. 9, 2012).

Defendant's citation to the 2015 FCC order cuts *against* its position. There, the FCC found that an "on-demand" text message does not violate the TCPA "so long as it: (1) is requested by the consumer; (2) is a one-time only message sent *immediately* in response to a specific consumer request; and (3) contains only the information requested by the consumer with no other marketing or advertising information." 30 FCC Rcd. 7961, ¶ 106 (FCC 2015). The FCC was addressing a situation where a consumer sees an advertisement, responds to the ad by texting a key word, and the retailer texts back a coupon. *Id.* at ¶ 103. This is the opposite of Defendant's unstoppable calls that occurred over three months.

### c. Plaintiff Pleads That the Calls Were Made Using an Artificial or Prerecorded Voice.

Plaintiff specifically pleads that he received from Defendant multiple calls using an artificial or prerecorded voice, including on February 12. [SAC, ¶¶ 92-93.] Plaintiff pleads that he was aware that these calls used an artificial or prerecorded voice "because of his familiarity

---

[3] The only court to cite *Pietzak* for its TCPA analysis rejected it as "limited", unpersuasive, and against the weight of authority. *George v. Shamrock Saloon II LLC*, 2010 U.S. Dist. LEXIS 5646, *13 n.7 (S.D.N.Y. Jan. 13, 2020).

7

with normal human interaction, intonation, manners of speaking, and his inability to engage the prerecorded or artificial voice in reciprocal, sensical communication or banter." [*Id.* at ¶ 92.] It is difficult to imagine what more can be pled on this point, but Defendant tries.

**First**, Defendant first falsely claims that Plaintiff's complaint does not provide the wording of any of the prerecorded/artificial calls. But Plaintiff explicitly pleads the language used at the beginning of the prerecorded calls and describes the purpose of those calls. [*Id.* at ¶¶ 80, 87.] Plaintiff also pleads that the substance of the calls echoed the substance of text messages quoted in the complaint.  [*Id.* at ¶¶ 62, 65, 88.] Regardless, Defendant points to nothing that requires the exact language of a call to be pled to demonstrate that the calls were prerecorded (nor is the exact language relevant to that determination, as such calls do not announce "I am robot.")

**<u>Second</u>**, Defendant misrepresents certain allegations in Plaintiff's complaint to say Plaintiff's complaint is somehow contradictory. For example, Defendant points to paragraphs 71-74, which relate to calling back Defendant's numbers and reaching an automated message identifying Defendant, and pretends that discussion was intended to support Plaintiff's prerecorded voice allegations. It was not. Similarly, Defendant points to Plaintiff's allegation that the wording of the calls varied from the text messages as contrary to an inference that the calls were prerecorded. But the wording used in a phone call being different from the wording in a text message is irrelevant.

**<u>Third</u>**, Defendant argues that the calls could not be prerecorded because Plaintiff pleads they "echoed" the content of the text messages, which included Plaintiff's name, and a prerecorded message could not have included Plaintiff's name.[4] Plaintiff, however, explicitly

---

[4] A computer-generated voice can easily say someone's name on an artificial voice call.

pleads that the wording of the calls varied from the text messages. [SAC, ¶ 88.] Defendant's cases do not help its cause. *Forney* involved whether the plaintiff had pled ATDS usage and, despite Defendant editing the word "prerecorded" into the *Forney* court's quote, the word "prerecorded" does not appear in the courts opinion. *Forney v. Hair Club for Men. Ltd.*, 2017 U.S. Dist. LEXIS 214251 (C.D. Cal. June 26, 2017). *Johansen* specifically says that a plaintiff making prerecorded voice allegations can plead, e.g. "the robotic sound of the voice on the other line [or] the lack of human response when he attempted to have a conversation with the 'person' calling him"—exactly as Plaintiff did here. *Johansen v. Vivant, Inc.*, 2012 U.S. Dist. LEXIS 178558, *10 (N.D. Ill. Dec. 18, 2012); *see also Padilla v. Whetstone Partners, LLC*, 2014 U.S. Dist. LEXIS 95308, *5-6 (S.D. Fla. July 14, 2014).

**Fourth**, in arguing that Plaintiff's allegations indicate he only spoke with live persons, Defendant *edits* paragraph 45 of Plaintiff's SAC to say "Plaintiff informed each caller on any call that he answered … that he was no longer interested in Defendant's services and asked Defendant to stop calling." [5] [MTD, p. 11.] This ellipsis was used to remove "(on which there was a live person with whom Plaintiff could speak)" from Plaintiff's allegation." Defendant attempts to justify this edit by claiming that it is entitled to rely on allegations in the previous complaint. This is wrong, as Defendant well knows. "[A]mended pleadings supersede original pleadings." *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 617 (6th Cir. 2014); *Glass v. Kellogg Co. Bakery*, 252 F.R.D. 367 (W.D. Mich. 2008) ("The filing of the amended complaint

---

[5] At a certain point, Defendant loses the benefit of the doubt on such edits. Changing the meaning of statements, complaints, briefs, and legal authorities through clever use of ellipses or outright fabrications has been found to be sanctionable conduct. *See, e.g.*, *Dube v. Eagle Global Logistics*, 314 F.3d 193, 194-95 (5th Cir. 2002) (imposing sanctions when appellant's brief had used ellipses to misrepresent statements and orders of the district court); *Precision Specialty Metals v. United States*, 315 F.3d 1346, 1355-56 (Fed. Cir. 2003) (affirming sanctions for distorting the meaning of legal authority through use of ellipses); *Bayou Inspection Servs. v. Orion Constr. LP*, 2013 U.S. Dist. LEXIS 34652, *4-5 (E.D. La. Mar. 13, 2013) (collecting cases).

render[s] the original complaint null and void …") (collecting cases at footnote 1).

Meeting Defendant's bad faith edit on its terms, "informing each caller" plainly refers only to those calls on which there was someone to inform. The same is true of Plaintiff's allegations that he spoke with live individuals on some calls. Nothing about those allegations contradict that there were other calls that used prerecorded or artificial voices.

**Finally**, Defendant suggests that it is improper for Plaintiff to claim that the voices were "artificial *or* prerecorded", and instead he must choose one. The statute does not require such a choice, and this standard represents an unreasonable expectation of a TCPA plaintiff.

    d.  <u>Plaintiff Pleads That Defendant Lacked Prior Express Written Consent.</u>

Though consent this is an affirmative defense, Plaintiff addresses it here.

1. Defendant Never Obtained Prior Express Written Consent

A telemarketer must obtain "prior express written consent" from a consumer prior to making prerecorded or artificial telemarketing calls to that consumer. Whereas "prior express consent" (the requirement for non-telemarketing) has been found when a consumer provides their number to a caller, "prior express written consent" requires a written agreement "clearly authoriz[ing] the seller to deliver or cause to be delivered to the person called … telemarketing messages using an automatic telephone dialing system or artificial or prerecorded voice[.]" 47 C.F.R. § 64.1200(f)(9). This requires a "clear and conspicuous disclosure informing the person signing that … such a person authorizes the seller" to make telemarketing calls to them using an automatic telephone dialing system or artificial or prerecorded voice. 47 C.F.R. § 64.1200(f)(9)(i). "Clear and conspicuous" is defined as "notice that would be apparent to the reasonable consumer, separate and distinguishable from the advertising copy or other disclosures." 47 C.F.R. § 64.1200(f)(3). In enacting the prior express written consent

10

requirement and related definitions, the FCC wrote that

> a consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer *will receive future calls that deliver prerecorded messages* by or on behalf of a specific seller; and (2) having received this information, *agrees unambiguously* to receive such calls at a telephone number the consumer designates.

27 FCC Rcd. 1830, ¶ 33 (2012) (emphasis added). This was reiterated in 2015, when the FCC

wrote our rules require prior express written consent *with the specific disclosures*." 30 FCC Rcd.

7961, 8016 n. 363 (emphasis added).

The Sixth Circuit has agreed, writing that "[t]he FCC's regulations for telemarketers now

require a more specific type of consent – namely, that the called party consents, in writing, to

being called *by an auto-dialer*."[6] *Hill*, 799 F.3d at 552 (emphasis in original); *see also Allard v.*

*SCI Direct, Inc.*, 2017 U.S. Dist. LEXIS 107106, *12-13 (M.D. Tenn. July 10, 2017) (denying

MSJ on consent because defendant did not disclose the possibility of prerecorded calls).

Courts outside the Sixth Circuit agree as well. In the Central District of California, the

court denied a Motion to Dismiss, writing that "[a]lthough plaintiff provided his personal

information on Defendant's website submission page, he did not give clear written consent to

receiving messages using … an artificial or prerecorded voice as required[.]" *Perri v. Rescue 1*

*Fin., LLC*, 2015 U.S. Dist. LEXIS 95717, *1-2 (C.D. Cal. July 22, 2015) ("The term prior

express written consent means an agreement, in writing … that *clearly* authorizes the seller to

deliver or cause to be delivered to the person called … telemarketing messages *using … an*

*artificial or prerecorded voice*….") (emphasis in original); *see also, e.g.*, *Soular v. Northern Tier*

*Energy LP*, 2015 U.S. Dist. LEXIS 112294, *16-17 (D. Minn. Aug. 25, 2015) (emphasizing that

---

[6] *Hill* dealt with allegations of auto-dialer usage, but the auto-dialer language emphasized comes from the same sentence requiring disclosure of artificial/prerecorded voices.

prior express written consent requires a disclosure that the calls will be made using an ATDS); *Lennartson v. Papa Murphy's Holdings, Inc.*, Case No. C15-5307, 2016 U.S. Dist. LEXIS 725, *7 (W.D. Wash. Jan. 5, 2016) (defendant failed to comply with the requirements of written consent because defendant "continued to text [plaintiff] … without disclosing that it was using an autodialing system to do so.")

In other words, a telemarketer must do more than inform the consumer of the possibility of telemarketing. It must clearly and conspicuously inform the consumer that telemarketing calls will be made *and* whether those calls will use an autodialer *and* whether they will use a prerecorded or artificial voice.

None of Defendant's websites, including the one Plaintiff used, disclose the possibility of prerecorded or artificial voice calls. Defendant's disclosures instead state that it may use "automated technology" to telemarket to the signer. [SAC, ¶¶ 117-121.] "Automated technology" is incredibly vague, and could seemingly encompass something as limited as speed dial or redial functions. It is a stretch, however, to include "prerecorded" or "artificial" voices under that umbrella, as there is nothing "automated" inherent in prerecorded or artificial voices. While the calls containing those voices are likely made using automated means, the statute requires disclosure of *both* the use of an auto-dialer, if applicable, *and* the use of a prerecorded or artificial voice, if one is to be used. It would eviscerate the mandate of a "clear and conspicuous" disclosure to find that such a broad, generic term as "automated technology" satisfies statutory requirements intended to let consumers make an informed choice about the kinds of calls they are willing to receive.[7]

---

[7] This is not just "gotcha" semantics or asking for magic words. Not only are the statute and FCC both clear, but there are perfectly valid reasons why someone might be willing to consent to calls using automated technology with live persons and not be willing to consent to impersonal, annoying prerecorded and artificial voice calls.

As for Defendant's separate privacy policy, it was not provided on the form Plaintiff filled out, so it is irrelevant to Plaintiff's individual claims. [SAC, ¶¶ 42, 119.] However, it also fails to provide the required disclosures. Specifically, it states that Defendant "may also leave pre-recorded[sic] on any number you provide us". [SAC, ¶ 124.] Because Defendant appears to have omitted a word, "pre-recorded" modifies nothing, making it unclear what Defendant is claiming it might leave "pre-recorded". Context does not help. The preceding sentence states that Defendant may use the provided phone number to telemarket or to confirm transactions, but the "pre-recorded" language is set off in its own sentence, leaving consumers to wonder what "pre-recorded" can be left. Prerecorded voicemails related to account servicing? Transactions? If it was intended to provide consent for prerecorded telemarketing, there is no reason not to include it as a clause in the preceding sentence dealing with telemarketing.

In addition to the flawed content, Defendant's disclosures are hidden. As Plaintiff details in his complaint, Defendant's disclosures, including those on the site on which he provided his information, are placed in a way that are either extremely difficult to read due to the font color and background, placed where a mobile phone keyboard covers up the disclosure due to Defendant's intentional design, or placed where it is possible to submit the form without seeing the disclosures. [SAC, ¶¶ 101-116.]

The Court need not definitively resolve the propriety of Defendant's disclosures now, but Plaintiff's allegations make it plausible that Defendant's disclosures are insufficient to qualify as "prior express written consent."

        2. Plaintiff Revoked Any Prior Express Written Consent Defendant Believed it had.

"[A] called party may revoke consent at any time and through any reasonable means. A caller may not limit the manner in which revocation may occur." 30 FCC Rcd. 7961, ¶ 55.

13

To the extent Plaintiff provided valid express written consent, he revoked it. Plaintiff specifically pleads that, beginning with the second call on November 16, he informed each live caller that he was no longer interested and asked Defendant to stop calling him. [SAC, ¶ 45.] Plaintiff pleads on November 17 that he called Defendant and relayed the same. [*Id.* at ¶ 46.] On November 16 and 17, Plaintiff sent four different email replies to Defendant, stating "I am no longer interested in Choice" because of its harassment and predatory tactics. [*Id.* at ¶ 49.] Rather than respect Plaintiff's request, Defendant responded "Excuse me for living." [*Id.* at ¶ 50.] On November 17, Plaintiff filed a BBB complaint about the frequency of calls and reiterated that he was no longer interested in their services. [*Id.* at ¶ 55.] Defendant, in response, stated it would place Plaintiff's information on an apparently non-existent do-not-call list in 14 business days. [*Id.* at 56.] Not wanting 14 more business days of calls, Plaintiff responded that Defendant's conduct was "borderline harassment", "completely unprofessional", and wrote that 14 more days of calls was unacceptable. [*Id.* at 57.] Plaintiff continued to receive calls and texts well beyond these 14 business days. One of those texts invited Plaintiff to text "no" to prevent further texts, which he did. [*Id.* at ¶ 62-64.] The texts continued.

In its defense, Defendant suggests Plaintiff's requests—informing Defendant that he was no longer interested and asking Defendant to stop calling because its calls were harassing and predatory—were vague and ambiguous. [MTD, p. 16.] If the Court needed any additional evidence that Defendant's policies and procedures were non-existent or entirely inadequate, as discussed more below, it is hard to think of much better at this stage than this argument.

Defendant also (again) attempts to rely on previous iterations of the complaint which state that Plaintiff "rejected" Defendant's offer to put him on its do-not-call list. Defendant is again being disingenuous. While previous complaints have no legal relevance, what was

14

"rejected" was the purported 14 business days to stop the calls, as Plaintiff made clear in his response when he wrote that "14 more days of calls is unacceptable."

Finally, Defendant claims that Plaintiff told Defendant he needed more time to make a decision, which Defendant claims is inconsistent with revocation. Defendant points to nothing in the complaint where Plaintiff says *he* told Defendant he needs more time to make a decision, nor would it be contradictory even if he did. If Plaintiff had first said "I need more time to make a decision" and then subsequently said "stop calling me", there is no contradiction or ambiguity. In the end, however, regardless of what Defendant thinks about revocations prior to the BBB complaint, it fails to provide any argument as to how the BBB complaint does not qualify as revocation.

One last point: in its citation to the 2015 FCC Order, Defendant *again* misleadingly edits authority to support its argument, quoting the FCC as saying that absent a "clear revocation" of consent, "the caller may reasonably rely on the validity of consent previously given[.]" (MTD, p. 16) (quotations in brief). But *nowhere in the 2015 FCC Order does the "clear revocation" language appear.* Instead, Defendant invents language in a paragraph in which the FCC explained that simply porting a number from a wireline to a wireless service does not alone revoke consent. 30 FCC Rcd. 7961, ¶ 54.

e. <u>Count I and Count II are not Redundant.</u>

Defendant seeks dismissal of Count II as redundant of Count I. Count I covers only those calls made when no prior express written consent was ever given. Count II covers only those calls made after prior express written consent was revoked. These are pled in the alternative, which is permissible. *See* Fed. R. Civ. P. 8(a)(3); *Solo v. UPS Co.*, 819 F.3d 788, 796 (6th Cir. 2016). If proper consent never existed from Defendant's websites, Count I is in play; if proper

consent existed, only Count II is in play. While Plaintiff agrees that one call cannot constitute two violations of § 227(b), that does not mean violations of § 227(b) relying on two different theories cannot be pled.[8]

## II. Plaintiff Pleads a Violation of § 227(c)'s Prohibition of Telephone Solicitations to Person's Whose Telephone Numbers are on the National Do-Not-Call Registry.

To state a claim for a violation of § 227(c), Plaintiff must plead that he received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under § 227(c). The two regulations prescribed thereunder are found at 47 C.F.R. § 64.1200(c) and § 64.1200(d).[9] Section 64.1200(c) prohibits a person or entity from initiating any "telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone on the national do-not-call registry[.]" Section 64.1200(e) expanded this protection to cell phones. Importantly, these regulations do *not* require the use of an autodialer or prerecorded/artificial voice.

Combining § 227(c) and § 64.1200(c), Plaintiff must show that 1) in a 12-month period, he received more than one 2) telephone solicitation 3) which Defendant or someone on its behalf initiated 4) to a residential subscriber who had registered their number on the National Do-Not-Call Registry.

### a. Plaintiff Pleads That the Calls Were Telephone Solicitations.

"Telephone solicitation means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person[.]" 47 C.F.R. § 64.1200(f)(15). Relevantly, excluded are calls

---

[8] Though it seems to elevate form over function, Plaintiff could, in theory, plead this is as a single count, with a more generalized Count I, and then use subclasses for the distinction between those who never gave prior express written consent and those who gave it and subsequently revoked it.

[9] Section 64.1200(d) will be discussed in the next section.

made to any person with that person's prior express invitation or to any person with whom the caller has an established business relationship. Other than these exceptions, this definition is identical to that for telemarketing. As Plaintiff has pled that these calls were telemarketing, the only unique questions here are whether an exception applies. Though these exceptions are affirmative defenses, Plaintiff's pleadings show they do not.

As discussed above, consent can be revoked, and Plaintiff pleads that he did just that. Accordingly, telemarketing calls made after Plaintiff's revocations were made without Plaintiff's express invitation or permission, and are thus telephone solicitations.

Similarly, an established business relationship can be terminated. 47 C.F.R. §. 64.1200(f)(5)(i) ("The subscriber's seller-specific do-not-call request … terminates an established business relationship[.]") As Plaintiff made a do-not-call request, any established business relationship was terminated.

With no applicable exceptions, and the calls otherwise meeting the definition of "telephone solicitation", Defendant's post-revocation calls were "telephone solicitations", for the reasons set forth *supra* in section I(b).

> b. Plaintiff Pleads That He Received From Defendant More Than One Call in a 12-Month Period.

Plaintiff pleads he received no less than 20 telephone solicitations from Defendant between November 16, 2020 and February 15, 2021. [SAC, ¶¶ 67, 69-86.] Of these, 18 were after his first oral revocation of consent and 14 after his BBB complaint about the calls.

> c. Plaintiff Pleads That He Was a Residential Telephone Subscriber.

Plaintiff alleges throughout the operative complaint that his telephone number was a residential, personal number. [SAC, ¶¶ 39, 140, 170.] This is sufficient. Plaintiff also pleads that his telephone number is a cell phone number. [*Id.* at ¶ 39.] Cell phone numbers on the DNC

Registry are presumed to be residential. *See* 47 C.F.R. § 64.1200(e) (extending the protections of § 64.1200(c) and § 64.1200(d) to wireless telephone numbers); 18 F.C.C. Rcd. 14014, ¶ 36 (noting the presumption that "wireless subscribers who ask to be put on the national do-not-call list" are "residential subscribers"). At this stage, this presumption is independently sufficient to satisfy Plaintiff's pleading requirement. Defendant presents nothing to the contrary. *See, e.g.*, *Hodgin v. Parker Waichman LLP*, 2015 U.S. Dist. LEXIS 192262, *9-10 (W.D. Ky. Sept. 30, 2015).

Further, it is not the subscriber's *use* of a telephone number that determines whether that person is a "residential subscriber[.]" Instead, the terms "business subscriber" and "residential subscriber" are expressly defined in the same subchapter as the regulations at issue here. "[S]imilar language contained within the same section of a statute must be accorded a consistent meaning." *NUCA v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 502 (1998); *see also, e.g.*, *United States v. Davies*, 139 S. Ct. 2319, 2329 (2019) (considering nearly identical language in two different statutes and writing "we normally presume that the same language in related statutes carries a consistent meaning."); *Lobbins v. United States*, 900 F.3d 799, 802 (6th Cir. 2018) ("[A]bsent good reason to do otherwise, we give the same words the same meaning throughout the same statute."); Antonin Scalia & Bryan A. Garner, *Reading Law* 170 (2012) ("A word or phrase is presumed to bear the same meaning throughout a text", and only "a material variation in terms suggests a variation in meaning.")

The term "[b]usiness subscriber refers to a subscriber to telephone exchange service for businesses." 47 C.F.R. § 64.2305(b). The term "[r]esidential subscriber refers to a subscriber to a

telephone exchange service that is not a business subscriber." 47 C.F.R. § 64.2305(c).[10] The regulatory definitions of these terms pre-date the creation of the DNC Registry by almost four years. *Compare* 18 F.C.C. Rcd. 14014 (June 26, 2003) (creating DNC Registry) *with* 47 C.F.R. §§ 64.2305(b) and (d) (effective date October 5, 1999).

As such, determining whether a phone number is protected by the DNC Registry simply requires an examination of whether the number is subscribed to a consumer or business.[11] Telephone numbers subscribed to consumers are protected by the DNC registry; telephone numbers subscribed to businesses are not.[12]

Under the "use" interpretation Defendant prefers, a consumer who lists their personal cell phone number on the DNC Registry risks losing their privacy protections if they use their personal cell phone to make work-related calls. A work-related call made from a personal telephone line, however, is still a call made from a personal telephone line. Similarly, a personal call made from a business line is still a call made from a business line.

In addition, "because the TCPA is a remedial statute, it should be liberally construed in favor of the consumer." *Ammons v. Ally Fin., Inc.*, 305 F. Supp. 3d 818, 824 (M.D. Tenn. 2018); *see also, e.g. Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959, 967 (7th Cir. 2020). Interpreting "residential subscriber" and "business subscriber" in line with their respective definitions protects every consumer who registers their telephone number on the DNC Registry. Defendant's interpretation, on the other hand, arbitrarily and without guidance limits

[10] Plaintiff acknowledges that there are cases that examined a subscriber's use. But none of the parties in those cases briefed these definitions those courts, and none of the courts considered these definitions.

[11] In addition to subscriber name and address, this could be determined by looking at whether a telephone number is subscribed to a business plan or personal plan.

[12] Resolution of this issue is not necessary to this Motion.

how a consumer may use their phone to maintain the TCPA's protection.

> d.   Plaintiff Pleads That his Telephone Number was on the National Do-Not-Call Registry at the Time of the Calls.

Plaintiff alleges that his telephone number was on the DNC Registry at the time of the calls. [SAC, ¶¶ 40, 138.] This is sufficient at this stage.

Plaintiff would, however, be remiss if he failed to address Defendant's argument that because Plaintiff did not previously allege that *he* placed his number on the DNC Registry, he cannot state a claim for a violation. While this was pled in Plaintiff's SAC, ¶ 139, it was not necessary for Plaintiff to do so. The private right of action in § 227(c)(5) allows for "[a] <u>person</u> who has <u>received</u>" two or more calls in a 12-month period in violation of the regulations prescribed thereunder to file suit. The regulation at issue—47 C.F.R. § 64.1200(c)—prohibits "initiating" a "telephone solicitation" to "[a] residential subscriber who has registered his or her telephone number on the national do-not-call registry[.]"

Distilled, the private right of action permits any "person", not just the "subscriber", to bring a claim if they 1) receive calls 2) initiated to a residential subscriber who has registered his or her number on the DNC Registry. The statute is violated when the call is initiated to a residential subscriber whose number is on the DNC Registry. The recipient of the illegal call has statutory standing. Nothing in the text of the statute or the regulations limits the cause of action to the person who placed the number on the registry.

Defendant's contrary argument has been rejected by most courts to have considered it (and similar) arguments. For example, in *Krakauer v. Dish Network, L.L.C.*, the Fourth Circuit rejected the defendant's argument that "the private right of action in § 227(c)(5) must be limited to 'subscribers' because it is telephone subscribers who can list their phone numbers on the national Do-Not-Call registry. 925 F.3d 643, 656-57 (4th Cir. 2019). The court wrote:

20

> Dish argues that the private right of action in § 227(c)(5) must be limited to "subscribers" because it is telephone subscribers who can list their phone numbers on the national Do-Not-Call registry. See 47 C.F.R. § 64.1200(c)(2). In the face of clear text pointing the other way, however, we see no reason that the private right of action should be limited only to those who can list their numbers on the registry. <u>If a wife, as the subscriber, lists a home telephone number on the Do-Not-Call registry, but her husband happens to be the one who receives the improper calls, the law has still been violated. Both the wife and the husband can suffer the harm that Congress sought to deter, and both are "persons" able to bring a claim under § 227(c)(5).</u>

*Id.* at 657 (emphasis added). *See also, e.g.*, *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316 (3d Cir. 2015); 30 FCC Rcd. 7961, 8001 ¶ 74 (2015) (interpreting "called party," as used in the TCPA, to include both the "subscriber and customary users" because both are those "whose privacy is interrupted by unwanted calls."); *Ammons*, 326 F. Supp. 3d at 590 ("[P]ersuasive authority holds that 'the intended recipient *need not* have answered the calls. *The act of placing the calls triggers the statute*.").

As a result, because the statute does not require that Plaintiff (or any other recipient) who received the telephone solicitations be the registrant, Defendant's argument should be rejected.[13]

### III.   Plaintiff Sufficiently Pleads a Violation of § 227(c)'s Requirement that a Company Implement Policies, Procedures, and Training Prior to Telemarketing.

Section 64.1200(d)'s requirement that companies implement minimum policies and procedures for maintaining an internal do-not-call list prior to making any telemarketing call was first put into place in the TCPA's implementing regulation. 7 FCC Rcd 8752, 8753 (Oct. 16, 1992) ("TCPA Implementation Order"). The FCC found that "the company-specific-do-not-call list … is the most effective and efficient means to permit telephone subscribers to avoid unwanted telephone solicitations." *TCPA Implementation Order* at 8765, ¶ 23. It "mandate[d]

---

[13] This argument is not about dismissal. What Defendant really seeks in raising arguments like this is for the Court to adopt a nuanced test that requires an examination of, for example, who placed the telephone number on the DNC Registry, which it will then use to say argue against predominance.

procedures for establishing company-specific do-not-call lists to ensure effective compliance with and enforcement of the requirements for protecting consumer privacy." *Id.* at ¶ 24. This regulation was amended in 2003 to require the policies and procedures to be implemented prior to making "any call for telemarketing purposes." 18 FCC Rcd. 14014, ¶ 96. The rule, as currently codified, states:

> No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber[14] unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity.

47 C.F.R. § 64.1200(d).

These procedures "must meet" minimum standards. Companies making telemarketing calls must maintain a written policy, available upon demand, for maintaining a do-not-call list; train and inform personnel engaged in telemarketing on the existence and use of the do-not-call list; record do-not-call requests when made; and honor do-not-call requests. *Id.* at (d)(1), (2) , (3) , (6). Telemarketers are "ultimately responsible … and fully accountable for any problems arising in the maintenance and accuracy of the list." *TCPA Implementation Order*, 7 FCC Rcd. at 8766 ¶ 24. "[I]f [the procedures in 47 C.F.R. § 64.1200(d)] are not implemented, each call made by a telemarketer constitutes a violation of the TCPA and the FCC regulations[.]" *Cordoba v. DIRECTV, LLC*, 320 F.R.D. 582, 587 (N.D. Ga. 2017); *see also, e.g.*, *Allard v. SCI Direct, Inc.*, 2017 U.S. Dist. LEXIS 107106, *14-17 (M.D. Ten. July 10, 2017). "The 'violation of the regulations' is … the initiation of the phone call without having implemented the minimum procedures." *Charvat v. GVN Michigan, Inc.*, 561 F.3d 623, 632 (6th Cir. 2009).

For Plaintiff to prevail on claim under § 64.1200(d), he must show 1) he received from

---

[14] In 2003, this was expanded to include calls to cellular telephones. 47 C.F.R. § 64.1200(e).

Defendant 2) more than one call in a 12-month period 3) that constitutes telemarketing. Plaintiff has pled each of these elements, as discussed throughout. Consent is not an issue for this claim because § 64.1200(d) applies to *telemarketing* (which does not contain a consent exception) rather than telephone solicitations (which does).

The final aspect—whether Defendant had the required policies and procedures in place—is an affirmative defense, given the introduction of those requirements with an "unless" clause, which is considered to be "telltale language … indicative of an affirmative defense." *Evankavitch v. Green Tree Servicing, LLC*, 793 F.3d 355, 362 (3d Cir. 2015). For the avoidance of doubt, however, Plaintiff pleads these elements as if he had the burden, as will be discussed below.

> a. <u>Plaintiff Pleads that Defendant did not Have a Written Do-Not-Call Policy Available Upon Demand.</u>

Plaintiff pleads that he called the telephone number listed on Defendant's website as the number to contact "to opt out of receiving mobile SMS or voice messaging from us." [SAC, ¶ 148.] On this call, he repeatedly asked Defendant for a copy of its written do-not-call policy and was repeatedly told that Defendant was unable to provide it. [SAC, ¶¶ 149-154.] As such, Defendant either did not have a written do-not-call policy, or it was not available upon demand. Defendant's reliance on its BBB response that it would take "up to 14 business days" to process Plaintiff's do-not-call request does not lead to the inference that it had a written do-not-call policy. First, the fact it took a BBB complaint to get Defendant's attention on this issue suggests the lack of a policy. Second, the 14-day timeline could just have easily been a guess, and the fact the calls did not actually stop suggests the lack of an actual or coherent policy on how to do so.

Defendant's reliance on its privacy policy is similarly unavailing. While Defendant's privacy policy provides a telephone number and email address to contact to "opt-out of receiving

mobile SMS or voice messaging", the written policy that must be maintained is *not* simply written instructions on who to call to begin the opt-out process, but a written policy for maintaining an internal do-not-call list. A company could have the most detailed list of instructions on how to opt out of its calls, but if it does not actually have a do-not-call list (or a related written policy on maintaining that list) to honor, track, and record opt-out requests, the statute is not satisfied.

Plaintiff not only demanded the written do-not-call policy via telephone, but brought this lawsuit which has been pending for five months. Defendant still has not produced the supposed policy. Even Defendant's affidavit, submitted to exculpate itself on the issue of prerecorded calls, was silent on the existence of the required policies, procedures, and training.

Finally, as stated, this is an affirmative defense. To prove this affirmative defense—that it had a written policy, available upon demand—it must produce the policy when demanded, not just rely on inferences that it exists.

> b. Plaintiff Pleads that Defendant did not Have Proper Policies and Training to Honor Do-Not-Call Requests.

In addition to maintaining a written policy, Defendant was required to train its telemarketing personnel on the existence and use of the do-not-call list and to record, document, and honor do-not-call requests. Though this too is an affirmative defense, Plaintiff's allegations give rise to the plausible inference it did none of those things. Defendant's rude response to Plaintiff's requests suggests a lack of training. [SAC, ¶ 157.] Defendant's refusal to honor Plaintiff's repeated requests suggests a lack of training and directly violates the requirement that it honor do-not-call requests. [SAC, ¶ 157-58.] The numerous other complaints about Defendant's calling practices and refusal to honor do-not-call requests—including nearly 100 on the BBB alone—suggest what happened to Plaintiff was not a one-off but was instead either an

24

intentional business decision or rooted in Defendant's refusal to do the bare minimum required by the statute. Defendant raises no argument about the deficiency of Plaintiff's pleadings on its training and failure to honor do-not-call requests. Defendant's Motion to Dismiss should be denied on this claim.

## DEFENDANT'S RULE 12(f) MOTION TO STRIKE

### I.     Class Allegations

#### a.   Motions to Strike Class Allegations are Disfavored.

While the Court has the authority to strike class allegations prior to a motion for class certification, it "should exercise caution when striking class allegations based solely on the pleadings, because class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Progressive Health & Rehab Corp. v. Quinn Med., Inc.*, 323 F.R.D. 242, 244-45 (S.D. Ohio 2017) (collecting cases); *cf. Doe v. City of Memphis*, 928 F.3d 481, 497 (6th Cir. 2019) (reversing grant of motion to strike because the motion was filed before plaintiffs had an opportunity for meaningful discovery). "[B]ecause "this remedy is 'drastic' and 'often is sought by the movant simply as a dilatory or harassing tactic,' '[s]triking a party's pleading . . . is an extreme and disfavored measure[.]" *Donelson v. Ameriprise Fin. Servs.*, 999 F.3d 1080, 1091-92 (8th Cir. 2021) (citation omitted). None of Plaintiff's proposed class are so facially and incurably defective to warrant striking them.

Alternatively, if the Court is inclined to find fault with any of Plaintiff's class definitions, the preferred remedy is to allow Plaintiff to fix those definitions. *See, e.g.*, *Sauter v. CVS Pharm., Inc.*, 2014 U.S. Dist. LEXIS 63122, *24 (S.D. Ohio May 7, 2014) (agreeing the appropriate remedy for a defective class definition is to permit amendment of those definitions rather than

25

striking them entirely) (collecting cases); *Alhassid v. Bank of Am., N.A.*, 307 F.R.D. 684, 694 (S.D. Fla. 2015) (noting that faced with a fail-safe class, "[t]he court may revise or permit the plaintiff to cure the flawed definitions."); *Salam v. Lifewatch, Inc.*, 2014 U.S. Dist. LEXIS 143222, at *3 (N.D. Ill. Sep. 22, 2014) ("A 'fail-safe' class problem, however, does not provide a basis to strike Plaintiff's class allegations. Even at the certification stage, this problem is one that "can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis.") (internal citations omitted); Newberg on Class Actions § 7:27 (5th Ed.) ("[A]s courts in every circuit have held, when a class definition is not acceptable, judicial discretion can be utilized to save the lawsuit from dismissal. Indeed, several circuits have held that a court *should* alter the class definition in lieu of rejecting class certification, if possible.")

      b.  <u>Plaintiff's Proposed Class Definitions are not Failsafe.</u>

A "fail-safe" class is "a class that cannot be defined until the case is resolved on its merits." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 638 (6th Cir. 2012). Such a class "includes only those who are entitled to relief." *Id.* Fail-safe classes are prohibited because they "would allow putative class members to seek a remedy but not be bound by an adverse judgment—either those class members win, or by virtue of losing, they are not in the class and are not bound." *Id.*

Defendant vaguely contends that Plaintiff's class definitions are fail-safe. It points to the part of the class definitions requiring a "telemarketing" call or text and to the part of some of the class definitions including only persons that "asked defendant to stop calling." Its cursory explanation simply says that these are merits-based inquiries.

First, all of Plaintiff's proposed classes as currently defined include persons who may or

may not be entitled to relief. Plaintiff's Prerecord Class, for example, is limited to those who provided their telephone number on one of Defendant's websites. Should Defendant's websites be found to qualify for prior express written consent, the persons who provided their numbers on those sites would not be "defined out"—they lose.

Similarly, in Plaintiff's Prerecord Revocation Class and Plaintiff's Registry Class, whether a class member "asked Defendant to stop calling" is an objective criteria. The Court or a jury still must examine such a request to determine whether it qualifies as a revocation. If asking Defendant to stop calling does not qualify as a revocation of consent those persons do not get "defined out"—they lose.

Limiting the classes to those who received "telemarketing" calls or texts also does not convert these to fail-safe classes. No liability determinations must be made to identify persons who received a telemarketing call or text, and persons who received such telemarketing calls are in the class, win or lose.[15] Furthermore, it cannot be the case that a class definition is fail-safe if it uses a common word that is also statutorily defined. If a plaintiff were required to avoid any commonly understood term that is also mentioned in the statute (such as "prerecorded" or "telemarketing"), class definitions would become incredibly unwieldy.

In any event, all of these "issues" can easily be cured if necessary. Plaintiff could replace the telemarketing language in the definition with something like "made for the purpose of marketing home warranty services", or "calls substantially similar to the calls Defendant made to the Plaintiff." Plaintiff could replace the "stop calling, or words to that effect" language with something like "when documents in Defendant's possession or in the possession of third-parties

---

[15] If Plaintiff were to receive a judgment on his class claims, and someone later attempts to sue Defendant under the TCPA for telemarketing calls within the class period, that person's claims would be barred by res judicata.

27

indicate Defendant received what it perceived as a do-not-call request from that person." None of these changes seem necessary, especially at this stage, but there are options available.

      c.  <u>Defendant's Predominance Argument is Meritless and Premature.</u>

Defendant claims that individual issues will predominate because "there are several places on multiple different websites where putative class members may have provided consent." This issue is only relevant to Plaintiff's proposed Prerecord Class. As pled, however, this would not create individualized issues. Plaintiff pleads that *all* of Defendant's forms were deficient and could not have qualified as prior express written consent. [SAC ¶¶ 117-129.] If that is the case, then there are *no* individual questions as to consent. *See Wolfkiel v. Intersections Ins. Servs. Inc.*, 303 F.R.D. 287, 294 (N.D. Ill. 2014) ("consent could be addressed on a class-wide basis where the source of the contact information for all of the recipients of unwanted faxes was a single 'leads' list compiled by a third party"); *Reyes v. BCA Fin. Servs., Inc.*, 2018 U.S. Dist. LEXIS 176628, 15-17(S.D. Fla. Oct. 15, 2018) (denying motion for reconsideration of order certifying class, noting that defendant's own arguments suggested that consent could be determined without individualized inquires, such as based on the fact that defendant only allegedly called phone numbers obtained the same way). Should discovery reveal Defendant obtained telephone numbers from websites that do not contain identical disclosures to the ones Plaintiff claims deficient, this can be addressed by narrowing the proposed class definition later.

Defendant also argues that Plaintiff "suggests that countless third parties … may have been involved in placing the at-issue calls and texts." It is unclear where Defendant finds this allegation.

Defendant finally claims that revocation (relevant to the Prerecord Revocation Class and Policy Subclass) will present individual issues, but Defendant is required by law to keep an

internal do-not-call list. If Defendant continued to place calls to persons on that list, there are no individual issues regarding revocation, as everyone on that list revoked consent.[16] If Defendant did not keep such a list—or kept the list poorly or inadequately—Defendant invites a spoliation finding and/or treble damage liability under § 64.1200(d). It is premature to determine which way this will go, but it is not necessarily true that individual issues of revocation will predominate. Discovery is necessary. *See, e.g.*, *Glass v. Tradesmen Int'l, LLC*, 505 F. Supp. 3d 747, 769 (N.D. Ohio 2020) ("[A] district court may strike class allegations when no discovery or factual development 'would alter the central defect in th[e] class claim.") (quoting *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 949 (6th Cir. 2011)).

Other courts have found that "the question of consent is not necessarily a bar to class certification in a TCPA action." *Ahmed v. HSBC Bank United States, Nat'l Ass'n*, 2017 U.S. Dist. LEXIS 183912, at *6 (C.D. Cal. Nov. 6, 2017) (citing *Caldera v. Am. Med. Collection Agency*, 320 F.R.D. 513 (C.D. Cal. 2017) (granting class certification of TCPA class and finding "no indication that individualized issues of consent would be an obstacle to managing this case as a class action"); *Bee, Denning, Inc. v. Capital Alliance Grp.*, 310 F.R.D. 614, 629 (S.D. Cal. 2015) ("Where a party has not submitted any evidence of . . . express consent, courts will not presume that resolving such issues requires individualized inquiries."); *Kristensen v. Credit Payment Services*, 12 F.Supp.3d 1292, 1307 (D. Nev. 2014) ("courts should ignore a defendant's argument that proving consent necessitates individualized inquiries in the absence of any evidence that express consent was actually given.").

The cases to which Defendant cites do not help its position. *Sandusky*, *Visser*, and

---

[16] We also know that Defendant responded to BBB complaints about its communications and indicated, using formulaic language, when it believed a do-not-call request had been made. Revocation could therefore be determined not just by looking at Defendant's required DNC list, but also by searching its records for language indicating its own belief as to revocation, obviating the need for individual inquiry.

*Saulsberry* involved the denial of a motion for class certification after discovery. *Eldridge*, *Cholly*, and *Dorfman* involved non-telemarketing calls. As they were non-telemarketing, those defendants were not required to maintain a do-not-call list through which "stop calling" requests could be determined on a class-wide basis. *Lindsay* involved faxes and a motion to strike purportedly fail-safe class definitions.

Defendant makes no predominance arguments against Plaintiff's proposed Policy Class.

Accordingly, this Court should address any predominance argument at the class certification stage, after a full and thorough discovery period.

> d.   Plaintiff's Proposed "Registry" and "Policy" Class Definitions are not Overbroad.

After arguing that Plaintiff's class definitions are fail-safe because they only include those to whom it would be liable, Defendant then argues that class definitions are too broad, because they would include persons to whom Defendant would not be liable. Specifically, for the Registry and Policy Classes, Defendant claims that the inclusion of all persons to whom Defendant made calls, rather than just "residential subscribers", is problematic.

This argument is premature. For these class definitions to be overbroad, there would need to be some evidence or indication that Defendant placed calls to non-residential subscribers, i.e. business subscribers. At this point, there is none (nor would it make sense for Defendant, which sells *home* warranty services, to call non-residential subscribers). Even if some small number of non-residential subscribers are included, this does not make the class definition overbroad. *See Colley v. P&G*, 2016 U.S. Dist. LEXIS 137725, *24 (S.D. Ohio Oct. 4, 2016) ("A proposed class is facially overbroad if it includes *significant* numbers of consumers who have not suffered any injury or harm."); *see also, e.g., Torres v. Mercer Canyons, Inc.*, 853 F.3d 1125 (9th Cir. 2016) (rejecting as inaccurate the argument that a class cannot contain any uninjured members);

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 823 (7th Cir. 2012) ("[S]ome class members' claims will fail on the merits if and when damages are decided, a fact generally irrelevant to the district court's decision on class certification.").

If it proves to be the case that significant number of non-residential subscribers are included, Plaintiff or the Court can modify the class definition at the class certification stage (or even after). *See, e.g.*, Fed. R. Civ. P. 23(c)(1)(C); *In re Nationstar Mortgage, LLC*, 2019 U.S. App. LEXIS 11986, *3-4 (6th Cir. Apr. 23, 2019); *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) (District courts have "broad discretion to modify class definitions"); *Kopaleishvili v. Uzbek Logistics Inc.*, 2019 U.S. Dist. LEXIS 209529, at *7-8 (S.D. Ohio Dec. 5, 2019) (analyzing a narrowed class definition proposed in plaintiff's reply brief for purposes of class certification).

Courts commonly certify TCPA class actions involving telephone numbers on the DNC Registry. To ensure that numbers subscribed to or used by businesses are not included in these cases, courts have repeatedly recognized expert analysis of industry leading and reputable data sources to identify and remove business phone numbers from class lists. *See, e.g.*, *Williams v. Pillpack, LLC*, 2021 U.S. Dist. LEXIS 27496, *14-15 (W.D. Wa. Feb. 12, 2021) (certifying DNC Registry class, and approving methodology whereby data analysis is used to remove business numbers); *Chinitz v. Intero Real Estate Serv.*, 2020 U.S. Dist. LEXIS 247921, *44 (N.D. Cal. July 22, 2020) (same); *Wakefield v. Visalus, Inc.*, 2019 U.S. Dist. LEXIS 141974, *20-21 (D. Or. Aug. 21, 2019); *Krakauer*, 925 F.3d 643 (upholding jury verdict in favor of certified DNC Registry class).

e.   Plaintiff's Class Definitions are not "Impermissibly Vague".

Defendant claims Plaintiff's class definitions are impermissibly vague. They are not. The

portion of several of Plaintiff's revocation-related classes requiring the putative class member to have asked Defendant to stop calling or "words to that effect" simply acknowledges the reality that it is *currently* impossible to currently identify every phrase someone might have said to revoke consent. However, if Defendant complied with the requirement to maintain a do-not-call list and document and honor revocation requests, we can determine the effect of the words by reviewing Defendant's do-not-call list. Further, if Defendant complied with the requirement to maintain a written policy and to train its personnel on the use of the do-not-call list, this material might shed light on other "words to that effect". What Defendant complains is "vague" now is only ostensibly vague because of the stage of the case. *Cf. Kensu v. Mich. Dep't of Corr.*, 2020 U.S. Dist. LEXIS 61590, *7 (E.D. Mich. Apr. 8, 2020) ("A complaint's proposed class definition … does not bind the court[.]")

Defendant also takes issue with the Prerecord Class including anyone who provided their number through "one of Defendant's websites." Plaintiff alleges that all of Defendant's websites suffer from the same flaws. Defendant has a finite number of websites through which it obtains consent. Defendant knows from where it got each person's information. This is not vague.

Confusingly, Defendant also claims it to be vague that certain of Plaintiff's class definitions require receipt of "two or more telemarketing ***calls or messages***" (emphasis in MTD). Plaintiff is unclear what is vague about the phrases calls or messages in a TCPA case dealing with telephone calls and text messages, and Defendant does not elaborate.

    f.   <u>Plaintiff's Class Definitions are not Redundant</u>

Defendant contends Plaintiff's Prerecorded Revocation Class and Policy Subclass are redundant. They are not. The Prerecorded Revocation Class includes only persons who received at least one prerecorded telemarketing call after asking Defendant to stop. The Policy Subclass

includes only persons who received two or more telemarketing calls in a 12-month period after asking Defendant to stop. These classes pursue entirely different claims, with the Prerecorded Revocation Class pursuing § 227(b) and the Policy Subclass pursuing § 227(c) through § 64.1200(d). A person who received a single prerecorded telemarketing call after asking Defendant to stop calling would be a member of the former but not the latter, while a person who received five live telemarketing calls after asking Defendant to stop calling would be a member of the latter but not the former. There are certainly some persons who will be members of both classes, but because these classes plead claims under two separately actionable provisions of the TCPA, they can recover in both classes.

## II.    "Superfluous" Allegations

Defendant asks to strike two sets of allegations in Plaintiff's complaint: other complaints about its conduct and details on websites Plaintiff did not use.

### a.   Other Complaints

The complaints of other consumers about Defendant's illegal conduct is relevant because the TCPA allows for treble damages for willful misconduct. These complaints come from Defendant's Yelp site and the BBB. Both sites put Defendant on notice of the allegations contained in the complaints. Indeed, in the case of BBB, Defendant actively responds to these complaints. If Defendant was aware of these complaints and continued its illegal conduct, it makes it more likely that Defendant's conduct is willful.

This is also relevant to whether Defendant had the proper policies, procedures, and training in place under § 64.1200(d). The number of complaints about Defendant's calling practices, with descriptions of conduct that mirrors Plaintiff's own experiences, make it plausible that Defendant's failures with respect to Plaintiff were rooted in its failures to comply with the

mandated policies and procedures of § 64.1200(d).

Finally, this is suggestive of numerosity. If this many people took the time to complain about Defendant's calling practices, then it seems numerosity is likely to be met.

> b. <u>Websites Not Used</u>

Defendant also asks the Court to strike details on CHW webpages Plaintiff did not use. But these allegations are important to show that Defendant did not make a practice of obtaining prior express written consent on *any* of its sites or in any of its policies, not just the site Plaintiff filled out. As this is a putative class action, and one of Plaintiff's definitions is specifically limited to those whose information Defendant obtained through one of its websites, information on those websites is relevant and certainly not immaterial, impertinent, or unduly prejudicial.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendant's Motions should be rejected in their entirety.

**Dated:** August 24, 2021

s/ Jeremy M. Glapion_____
Jeremy M. Glapion, Esquire
**THE GLAPION LAW FIRM, LLC**
1704 Maxwell Drive
Wall, New Jersey 07719
Tel: 732.455.9737
Fax: 732.965.8006
jmg@glapionlaw.com

**CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 7.2(b)(i)**

Pursuant to L.R. 7.2(b)(i), I hereby certify that this brief contains 10,693 words, and was generated using the most recent build of Microsoft Word for Microsoft 365.



s/ Jeremy M. Glapion_____
Jeremy M. Glapion

**CERTIFICATE OF SERVICE**

I hereby certify that on August 24, 2021, I served the foregoing document via the Court's ECF system, which sends notice of this filing to all registered users.

s/ Jeremy M. Glapion_____
Jeremy M. Glapion

35